**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-748 (JEB)** |
| **WILLIAM MERRY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Merry ("Merry") to a 120-day term of incarceration, one year of supervised release, 60 hours community service, and $500 restitution.

**I.    Introduction**

The defendant, William Merry, his friend Paul Westover ("Westover") (Case No. 21-cr-697 (JEB)), and Merry's niece Emily Hernandez ("Hernandez") (Case No. 21-cr-747 (JEB))[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in property damage totaling more than one million dollars.

---

[1] Westover pleaded guilty to one count of Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), on December 6, 2022, before this Court. Hernandez pleaded guilty to one count of violating 18 U.S.C. § 1752(a), Entering and Remaining in a Restricted Building or Grounds, on January 10, 2022, also before this Court. Both are due to be sentenced on March 21, 2022.

On January 5, 2022, Merry pleaded guilty to one misdemeanor count of violating 18 U.S.C. § 641: Theft of Government Property.  As explained herein, the government's proposed sentence is appropriate in this case because: (1) Merry was well aware that police officers were trying to disperse the crowd assembled outside of the Capitol, and yet he surged towards the Capitol Building anyway; (2) he stormed past multiple police lines after witnessing rioters forcibly remove barricades, leading his 21-year-old niece into the mob along with him; (3) he penetrated the U.S. Capitol all the way to the Speaker's suite and exited through a broken window; (4) he encouraged his niece to pick up a shard of Speaker Pelosi's office sign, which had just been smashed by another rioter, and then proudly displayed the stolen shard on Capitol grounds; (5) he roamed the Capitol tauntingly chanting "Nancy, Nancy" (i.e., Speaker Pelosi), calling her a "c**t" on multiple occasions; and (6) his conduct after breaching the Capitol—when the import of his actions should have been clear—suggests a lack of remorse.

Although he did not personally engage in violence or property destruction during the riot, he did engage in theft of government property, rendering him among the most culpable misdemeanor defendants arising out of the Capitol Breach.  Indeed, to date, no other Capitol Breach defendant has been sentenced on a theft conviction.

Merry also witnessed and celebrated the violence of that day.  Despite clear efforts from law enforcement officers—e.g., the use of munitions and tear gas—to hold back the crowd, Merry joined the mob in storming past several lines of law enforcement to breach the U.S. Capitol. Undeterred, he shouted, "we're going in," as he and other rioters ascended the stairwell to storm the Capitol.  Merry ultimately breached the Capitol and reached the Speaker's suite, where he witnessed rioters pry Speaker Pelosi's office sign from its post above an entryway and smash it

against the wall.  He then goaded Hernandez to pick up a shard of that sign, which they removed from the Capitol.  Later, Merry and Hernandez proudly displayed the shard on Capitol grounds.

Despite witnessing mob violence and being forced to crawl out of a broken window to exit the Capitol, Merry believed that his actions rendered him a "hero…tak[ing] our country back." Specifically, he appeared in an "interview" of Hernandez on Capitol grounds in which the interviewer stated: "you want to know how to defend your country?  You storm in there and you take your country back.  I'm here with the heroes who actually stormed [unintelligible] and we are actually going to take our country back."[2]  As the interviewer spoke, Merry posed next to her donning a smirk that suggested he supported her views.  Merry then drove with Hernandez and Westover, along with the shard of the Speaker's sign and other items stolen from the Capitol, back to St. Louis, Missouri.

The Court must also consider that Merry's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for Merry's actions and those of his fellow rioters, the riot likely would have failed.  Here, his participation in a riot that actually succeeded in halting the Congressional certification combined his celebration and endorsement of the violence on that day demonstrates why a term of incarceration is warranted.

---

[2] The interviewer does not appear to be affiliated with any news media organization, though public records indicate she is a producer for a TV commercial/advertising company.  It thus appears she was "interviewing" individuals on Capitol grounds for social media or promotional purposes.

## II.        Factual and Procedural Background

### a.    *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Statement of Offense ("SOO"), ECF No. 36, at 1-7.  As the Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### b.    *Merry's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Merry, Hernandez, and Westover (hereinafter, the "trio") traveled to Washington, D.C., from their homes in Missouri to attend the "Stop the Steal" rally.  At the time he traveled, Merry was aware that the Electoral College votes would be counted the next day at the U.S. Capitol.  SOO ¶ 9.

On January 6, 2021, Merry recorded a video of the trio marching to the Capitol along Pennsylvania Avenue.  *See* Ex. 1.[3]  Upon spotting the Capitol, he stated, "that's our building, we own it, I think we're going to go take it back today."  *Id.*  He added, "we're going in the front door, they ain't gonna stop us."  *Id.*

Once on Capitol grounds, Merry watched a group of men that he believed to be "Proud Boys" approach a set of barricades and begin arguing with the police on the outer perimeter of the Peace Circle.  *See* SOO ¶ 11; *see also* Ex. 2 (recovered from Westover's cell phone).  He then witnessed members of this group pushing and rocking a barricade back and forth until they dismantled it and police retreated.  SOO ¶ 11.  Westover recorded the tail end of this moment,

---

[3] All exhibits cited in this memorandum will be provided to the Court in advance of the sentencing hearing.

which occurred at approximately 12:50 p.m.  Ex 2.  The trio stepped over the now-dismantled fencing and bike racks as they continued on towards the Capitol building.  *Id.*

The trio followed the crowd to a set of steps outside the Capitol, just below the northwest scaffolding.  In this spot, Westover recorded a video stating that the trio was "on the front line." Ex. 3.  Heavily outnumbered police can be seen in the background trying to deter the crowd from breaching a bike rack barricade.  *See id.* and Figure 1.  Indeed, the trio was firmly enmeshed within the front line of individuals who have been identified as Proud Boys, including Joe Biggs and Ethan Nordean,[4] and who were up against this barricade, as seen in Figures 1 and 2 (both derived from Ex. 3).  Merry then witnessed rioters forcibly remove the police barricade in front of him and proceeded to follow them up the Capitol steps and past the retreating police officers.  *See* Ex. 3; Figure 2; SOO ¶ 12.



*Figure 1*

---

[4] Both have been charged in case number 21-cr-175 (TJK) with Obstruction of an Official Proceeding and Destruction of Government Property, among other charges.



*Figure 2*

Following these initial breaches, the trio joined a large crowd on the West Plaza at the foot of the inaugural stage, behind yet another police line, by approximately 1:00 pm. *See* Ex. 3; *see also* Ex. 4. For approximately an hour, the rioters engaged in continuing skirmishes with police over the fence lines. By 2:03 pm, police had declared that a riot had erupted and repeatedly broadcast a recorded dispersal order from a large speaker near the front of the inaugural stage. Merry also saw police deploy munitions and tear gas into the crowd. *See* SOO ¶ 13.

Indeed, Westover, with Merry and Hernandez at his side, recorded videos on his cell phone showing these efforts to disperse the rioters. In one video, Westover stated that things were "getting a little crazy again…somebody fired off some large fireworks"—presumably referring to law enforcement's deployment of munitions, as heard in the video. Ex. 4. Sometime thereafter, Westover recorded a video in which he lamented getting "tear gassed again," adding "that's always fun." *See* Ex. 5. In the background, rioters can be seen climbing the scaffolding set up in preparation for the presidential inauguration. *Id.*

In another video recorded by Merry on his cell phone, he stated "we were right by the front, but they were macing us," adding that "they were shooting rubber bullets at people." Ex. 6. He

then joined in a "Fight for Trump" chant, adding "it ain't over yet." *Id.*  Merry later said, laughing, "I can't believe … the first time I've ever been to the White House and I'm storming the motherf*****."[5]  *Id.*

The trio proceeded to climb the stairwell beneath the northwest scaffolding, at times crawling underneath scaffold poles, while Westover recorded the moment on this cell phone.  *See* Ex. 7.  In the video, Westover exclaimed, "we're storming the gates of the Capitol here."  *Id.*  The trio then ascended a set of steps to reach the Upper West Plaza.  *See* Ex. 8.  While walking up these steps, Merry exclaimed, "we're going in," while Westover shouted, "we're coming, Nancy!"  *Id.*  Other rioters chimed in, "I want Mitch"; "and now Pence."  *Id.*

The trio then crossed the Upper West Plaza and breached the Capitol through the Senate Wing door at approximately 2:20 pm.  *See* Ex. 9.  In a video recorded by Westover of this moment, an alarm is ringing loudly, broken glass is visible on the ground, and the Senate Wing door and adjacent windows have clearly been smashed.[6]  *Id.*; *see also* Figure 3 (a still from Capitol surveillance footage depicting Merry in his red Trump hat).  To the left and right of the trio, rioters entered the building through the broken windows.

---

[5] It is clear from context that he was referring to the U.S. Capitol, not the White House over a mile away.

[6] The windows were smashed out by rioters only seven minutes prior to the trio's breach.



*Figure 3*

The trio then made their way through the Crypt, where rioters chanted "stop the steal" and "where's the traitors?"  *See* Ex. 10.  In response to this latter call, Merry shouted, "bring 'em out!"  *Id.*  Westover again complained of "tear gas."  *Id.*

The trio continued on and approached the Speaker's Suite, while the mob, including Merry and Westover, chanted for "Nancy."  Ex. 11.  During this chant, Westover quipped, "I'm glad I already got my stimulus check," to which Merry responded, "I got mine too."  *Id.*  Just as a rioter began to pry the Speaker's office suite sign off its post above a doorway, Merry commented that it was for "the c\*\*t of the House."  *Id.*  He then witnessed a rioter smash the sign against a wall.  *See id.*; *see also* Exs. 12, 13.[7]  Merry then instructed Hernandez to "get a piece of that," which she did, picking up a shard of the now-broken sign from the floor.  *See* Exs. 11-13.  Merry and Hernandez then held up the shard to show it off to a reporter with a camera, while Merry stated, "here you go, brother."  Ex. 13 and Figure 4.

---

[7] Exhibit 13 was recorded by British media outlet ITV News and is publicly available here: https://www.youtube.com/watch?v=UBp42536IhE.



*Figure 4*

The trio ultimately reached the Rotunda, taking photos and videos.  Ex. 14.  Merry shouted, while entering the Rotunda, "we bought and paid for this!  We own this!"  Ex. 11.  As law enforcement officers deployed a chemical irritant to disperse the crowd gathered there, Merry shouted "f****** jack offs," adding "as soon as they get done, I'm getting up there and getting a picture of that," referring to a statue of Ronald Reagan.  *Id.*  He proceeded to climb the statue to pose for a picture.  *Id.*

While in the Rotunda, Merry picked up a phone on a desk and pretended to call "Nancy"— i.e., Speaker Pelosi.  *See id.*  In his faux phone call, with Hernandez giggling in the background, Merry ranted: "I've got an emergency: Nancy Pelosi is a c**t…let it all be known that Nancy Pelosi is a c**nt…I tried calling the c**t Nancy but she wouldn't answer.  Nancy, Nancy, c**t." *Id.*

The trio ultimately exited the Capitol by crawling through a broken window next to the Senate Wing doors at approximately 2:55 p.m.  In total, Merry spent nearly 40 minutes inside the

Capitol.  Merry has admitted that he knew at the time he entered the Capitol that he did not have permission to do so.  SOO ¶ 21.

Shortly after exiting the Capitol, Merry instructed Hernandez to hold up the shard of the Speaker's office sign for the crowd to see, which she did.  SOO ¶ 18; *see also* Figure 5.  He likewise carried the shard around above his head to display to the crowd on Capitol grounds.  *See* Figure 6. Merry also appeared to support the sentiments of an interviewer who stated that he was a "hero[]… tak[ing] our country back" for storming the Capitol.  *See* Ex. 15 and Figure 7.  The trio ultimately drove back to St. Louis with the stolen items in tow.  Hernandez later turned over those items to the FBI when she self-surrendered.



*Figure 5*



*Figure 6*



*Figure 7*

In the days after the riot, Merry communicated frequently with Hernandez and Westover

via text message.  On January 10, 2021, after sharing a still photograph of himself at the Capitol

from a 60 Minutes special, Merry wrote Hernandez: "My PATRIOT buddy we are going to be fine.  Don't worry anymore!!"  On January 12, as Hernandez debated whether to turn herself in after having been identified in the media, he advised her, "it is your call do what your heart tells you. A lot can happen in this world in 2 days. Hopefully something big to take the eyes off us."  He repeated this sentiment to Westover, stating "in the way this country is headed a whole lot can change in a matter of minutes hours and we have 8 days til the 20th."  Merry later told Hernandez, "Dont turn yourself in yet or call the lawyer yet. I believe something coming real big and will take the focus of [us] we have time."  Two days later, he shared a link to a video from podcast X22 Report with Hernandez,[8] stating: "Must watch.  I am not turning myself in….This video is mind blowing."

On January 20, the day of the presidential inauguration, Merry wrote Hernandez, "Your book title Accidental Patriot!!"  She later wrote him that "[t]here was more people in Florida waiting for trump than Biden's Inauguration," to which Merry responded, "[t]hat's because he's an illegal president and he will never be my president stolen election."

On February 3, the day after Hernandez's initial appearance in her matter in D.C., Merry wrote Westover: "All went good yesterday for Emily lifted some of her restrictions, so that's good. I kinda feel a lil guilty that they haven't h[ear]d from anyone. Emilys only one who got in trouble, none of this would have happened if she didn't have sticky fingers. I believe."  A few minutes

---

[8] The link in question, https://x22report.com/aiovg_videos/ep-2377b-checkmate-zero-day-approachessometimes-a-good-movie-can-reveal-alot-of-truth/#, appears to be broken and is from a podcast called X22 Report.  The day before the Capitol riot, X22 Report "spoke confidently about a Trump second term, explained that Trump would need to 'remove' many members of Congress to further his plans, and said 'We the people, we are the storm, and we're coming to DC.'"  Tali Arbel, *Extremists Exploit a Loophole in Social Moderation: Podcasts*, AP News (Jan. 19, 2021), *available at* https://apnews.com/article/donald-trump-conspiracy-theories-media-misinformation-social-media-b7bb0ace8a617af733357f6ee15aca03.  It is unclear whether Merry viewed such content before January 6.

later, he wrote Hernandez: "Just know I feel so guilty that you are the only one having to go through this, I never wanted any of this to happen to you."

> c. *Merry's Voluntary Interview with the FBI*

In anticipation of the plea agreement, Merry participated in a voluntary interview with the FBI and allowed law enforcement officers to review the digital contents of his phone and social media accounts.  Prior to the official interview, Merry commented to agents that the Capitol was "our building" and that he "paid for" it.  He also told FBI agents that police officers told him which door they could use to enter the Capitol, and that he never would have trespassed if he knew it was actual trespassing.

> d. *The Charges and Plea Agreement*

On January 27, 2021, Merry was charged by complaint with violating 18 U.S.C. §§ 641, 1752(a)(1) & (2), and 40 U.S.C. §§ 5104(e)(2).  On February 4, 2021, he was arrested in Missouri. On December 29, 2021, Merry was charged by Information with one count of violating 18 U.S.C. § 641, Theft of Government Property, a misdemeanor.  He pleaded guilty to this charge on January 5, 2022.  By plea agreement, Merry agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Merry now faces sentencing on a single count of violating 18 U.S.C. § 641.  As noted by the plea agreement and the U.S. Probation Office, Merry faces up to one year of imprisonment and a fine of up to $100,000.  He must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The government agrees with the Probation Office's calculation of the applicable Sentencing Guidelines range:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* Final Presentence Investigation Report ("PSR"), ECF No. 39, at ¶¶ 38-47.

The U.S. Probation Office calculated Merry's criminal history as a category I, which is not disputed. PSR at ¶ 50. Accordingly, the U.S. Probation Office calculated Merry's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 86. Merry's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *United States v. Rita*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (internal quotation marks omitted); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful

consideration to the Guidelines." *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. <u>See</u> 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one."

*Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve §

3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to a

Guidelines analysis.  In order to reflect Congress's will, the Guidelines will be a powerful driver

of consistency and fairness moving forward.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating a sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the government's proposed sentence of a 120-day term of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms—indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Before entering the Capitol, Merry crossed through numerous barriers and barricades and heard the throes of a mob, chiming in with his own rhetoric about "storming the motherf*****." As the video exhibits clearly show, Merry observed extensive efforts by U.S. Capitol Police to hold back the crowd, saw shattered windows at his location of entry, and smelled chemical irritants in the air. He was far from a mere tourist that day.

16

Additionally, while looking at Merry's individual conduct, this Court must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored commands from law enforcement officials; and (9) whether the defendant has demonstrated sincere remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Merry personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Merry's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Merry from most other misdemeanor defendants.  Merry's lack of violence and property destruction is the only reason he was permitted to plead guilty to a misdemeanor rather than a felony.

That said, having engaged in theft of government property, Merry is significantly more culpable than the vast majority of misdemeanor defendants charged in the Capitol riot cases.  He is also more culpable, in the government's view, because he encouraged and induced his young niece, whom he frequently refers to as "kid" and at one point an "accidental patriot," to commit multiple crimes that day.

As Exhibits 2 through 9 show, Merry was well aware of the force required to overwhelm law enforcement and make entry into the Capitol. Merry emphasized his proximity to that stand-off, bragging that "we were right by the front, but they were macing us." Ex. 6. He personally witnessed rioters forcibly remove multiple police barricades and proceeded to storm past outnumbered officers. Even though Merry was not the first to break the police lines, he clearly sponsored those rioters' actions when he gleefully shouted that he was "storming the motherf*****." *Id.*

Merry stayed in the area of continuing skirmishes with police for over an hour, despite increasing violence against law enforcement and clear signals that he was unlawfully present. As the police increased the force necessary to repel the crowd, Merry would have heard a dispersal order broadcast. In the videos he recorded, he acknowledged observing police firing increasingly powerful munitions into the crowd as well as the acrid smell of pepper spray in the air. *See id.* Despite this, Merry chose to advance past the police line, which crumbled shortly before he ascended the steps beneath the scaffolding and entered the building.

Merry entered the building less than ten minutes after it was first breached at his location of entry. While no police officers blocked his path, there were clear signs of violent entry. There can be no question, based on Exhibit 9, that Merry saw that the window adjacent to the door he entered through had just been smashed out. The video also makes clear that Merry heard the alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping similar to a smoke alarm. *Id.* He was aware that police on Capitol grounds were attempting to hold the mob back with chemical irritants and rubber bullets. Even after Merry witnessed rioters violently smash Speaker Pelosi's office suite sign, he did not turn back. Quite to the contrary, he celebrated it— saying the sign belonged to the "c**t of the House" and goading his niece to "get a piece of that."

Merry then proudly displayed the shard of the sign like a trophy for a nearby reporter and thereafter on Capitol grounds. *See* Ex. 11 and Figure 6.

The arguably nominal market value of the shard of Speaker Pelosi's shattered sign is what caused the government to charge Merry with misdemeanor, rather than felony, theft. But the symbolic value of the sign is precisely what made it a desirable "souvenir" in the eyes of Merry and the other rioters and is the reason why he posed for photos with it and then waved it in front of the braying crowd after leaving the Capitol.

Exhibit 11 is particularly notable not only for Merry's use of troubling language in reference to Speaker Pelosi, but also because it illustrates his lack of remorse for his part in a violent attack on the Capitol. After roaming the halls tauntingly chanting "Nancy," he entered the Rotunda, where he shouted, "we own this," and proceeded to climb a statue of "a real patriot," in his words: Ronald Reagan. *Id.* He then staged threatening faux phone calls to Speaker Pelosi, fanning the flames against a primary target of the mob.

Accordingly, the nature and the circumstances of this offense establish the clear need for a significantly deterrent sentence in this matter.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Merry lacks a criminal history and has been compliant with his conditions of release. He is retired and has been diagnosed with COPD and diabetes. PSR ¶ 65. Notwithstanding, a sentence imposing a period of incarceration is necessary in light of the substantial aggravating factors and Merry's persistent lack of remorse. Indeed, on the day of his recent interview with the FBI pursuant to the terms of his plea agreement, he repeated his sentiments from January 6 that the Capitol building was "our building" and that he "paid for that building," as if that were some sort of excuse.

Significantly, during his interview, Merry repeated the lie that police officers told him which door he could breach the Capitol through, a debunked claim oft repeated by Capitol Breach defendants.  He also stated he did not believe he was trespassing at the time, despite witnessing law enforcement's obvious efforts to hold the crowd at bay on Capitol grounds.  Such statements evince that he does not fully grasp the gravity of his own actions that day.

Merry also appears to believe that his current predicament is due to Hernandez's act of picking up the shard of Speaker Pelosi's sign—something he encouraged her to do—rather than his own actions in unlawfully breaching the Capitol as part of a mob.  The day before Merry and Westover were taken into custody, Merry opined that "none of this would have happened if [Hernandez] didn't have sticky fingers."  It is clear that he has failed to internalize that Hernandez picked up the shard at his urging, an additional and significant aggravating factor.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  FBI Director Christopher Wray, Statement before House Oversight & Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats. oversight.house.gov/files/Wray%20Testimony.pdf.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *Cf. United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these

offenses were an attack on our democracy and that jail time is usually – should be expected")
(statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence—the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

a. *General Deterrence*

The demands of general deterrence generally weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration, or some other combination of punitive terms.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes in this country: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider in these cases.

b.  *Specific Deterrence*

Merry's actions and statements, both during and after the riot, demand a sentence that will deter him from future crimes.  Merry celebrated the violence of the day when he induced Hernandez to pick up the Speaker's shattered sign and held it up for a reporter, saying "here you go, brother."  *See* Ex. 13.  After the attack, he viewed himself as a "hero" for storming the Capitol to "take our country back."  *See* Ex. 15.  And even as the consequences for the trio's illegal actions became apparent, Merry seemed to lay the blame at the feet of his 21-year-old niece, whom he should have been protecting and steering away from illegal conduct that day.

The government acknowledges that the defendant has accepted responsibility by entering into this plea agreement.  On the other hand, his failure to fully acknowledge his role on January 6 and his apparent lack of remorse underscore the need for a term of incarceration in this case.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this unprecedented assault on our Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on law enforcement officers, to conspiracy to obstruct the congressional

proceedings.[9]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probation-only sentence thus should not become the default.[10]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19 (the court should not "create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have made meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous and thus treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating conduct, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating conduct, deserve a sentence more in line with minor incarceration or home detention.

---

[9] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  This table shows that the sentence requested in this case would not result in unwarranted sentencing disparities.

[10]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-97 (PLF); *United States v. Donna Sue Bissey*, 1:21-cr-165 (TSC), *United States v. Douglas K. Wangler*, 1:21-cr-365 (DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-365 (DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence. Here, even though Merry, Hernandez, and Westover were not charged as coconspirators, their criminal conduct was entirely intertwined and mutually reinforcing. For that reason, this Court should structure the sentence of each of these defendants in a manner that reflects the relative culpability of each vis-à-vis the other two.

This Court should consider the sentences imposed in other Capitol Breach cases when fashioning a sentence for Merry. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here—indeed, no court in this district has yet sentenced a defendant who pleaded guilty to Theft of Government Property in connection with the riot at the Capitol—the Court may consider the sentences imposed in other Capitol Breach cases for comparison. For example, in *United States v. Johnson* (21-cr-648), Judge Walton imposed a sentence of 75 days of incarceration, 200 hours of community service, a $5,000 fine, and $500 in restitution. In that case, Johnson breached the Capitol and made it as far as the doors to the House Chamber. *See* Gov't Sentencing Memorandum, ECF No. 49, 21-cr-648. Like Merry, he saw

24

officers use tear gas to disperse the crowd and yet surged ahead, entering through the same door as Merry. Although Johnson was not accused of engaging in violence or destruction of property himself, like Merry, he witnessed rioters attempting to destroy government property and celebrated their actions. Johnson also carried around the Speaker's lectern and deposited it in the Rotunda to pose for photos with it, earning him the viral moniker, "podium thief." Unlike Johnson, however, Merry actually removed a piece of government property from the Capitol building and was seen wielding it triumphantly on Capitol grounds. *See* Figure 6. Merry also ominously chanted Speaker Pelosi's name and made threatening faux phone calls to her. And unlike Johnson, who in the government's view demonstrated genuine remorse, Merry has not and instead has dug in his heels by repeating nonsense about the events of that day as recently as last month.

The Government has requested, and the courts have imposed, sentences of incarceration in most cases where defendants gained entry to sensitive spaces inside of the Capitol Building. *See, e.g., United States v. Mazzocco*, 1:21-cr-54 (TSC) (sentenced to 45 days of incarceration where defendant entered conference room area known as Spouse's Lounge); *United States v. Pham*, 1:21-cr-109 (TJK) (sentenced to 45 days of incarceration where defendant walked into office area with desks, a computer, and numerous paper files); *United States v. Bonet*, 1:21-cr-121 (EGS) (sentenced to 90 days of incarceration where defendant smoked marijuana in Senator's private office); *United States v. Ericson*, 1:21-cr-506 (TNM) (sentenced to 20 days of weekend incarceration where defendant entered Speaker's conference room and other office space;); *but see United States v. Marquez*, 1:21-cr-136 (RBC) (government requested four months of incarceration for defendant who entered Senator Merkley's office; sentenced to 18 months' probation, citing mental health issues). Here, worse than entering a sensitive (but empty) space, Merry stole a piece

25

of the Capitol bearing the name of the person rioters were threatening to shoot in the head and hang.[11]

The Court should also refer to the sentences it imposed in *United States v. Derek Jancart and Erik Rau*, 1:21-cr-148 (JEB), as guideposts. Jancart and Rau each received sentences of 45 days of incarceration. They observed significant violence as they approached the Capitol building and cheered upon seeing it, similar to Merry, who bragged that he was "storming the motherf*****" as rioters skirmished with police. *See* Ex. 6. Like Merry, Jancart and Rau entered through the Senate Door shortly after it was breached. The duo made their way to a highly sensitive area of the Capitol building—Speaker Pelosi's conference room—whereas Merry reached Speaker Pelosi's office suite where he held up smashed government property like a trophy.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court

---

[11] *See, e.g.*, *United States v. Pauline Bauer*, 21-cr- 386, ECF No. 2-1 ("They need to hang…Bring her out…Bring Nancy Pelosi out here now. We want to hang that f****** b****."); *United States v. Cleveland Meredith*, 21-cr-159, ECF No. 47 ("Thinking about heading over to Pelosi C[**]T's speech and putting a bullet in her noggin on Live TV")

might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.        Conclusion

Sentencing requires the Court to balance the § 3553(a) factors carefully.  Balancing these factors, the government recommends that this Court sentence William Merry to 120 days of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.  Such a sentence promotes respect for the law and deters future crime by this defendant and others by imposing restrictions on his liberty, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By: _Jessica Arco_
_____
Jessica Arco
D.C. Bar No. 1035204
Trial Attorney – Detailee
U.S. Attorney's Office
555 4th Street NW
Washington, DC 20530
Jessica.arco@usdoj.gov