UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | USDC No. 21-cr-748 (JEB) |
| | ) | |
| William D. Merry, Jr.,  *defendant*. | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid him at his sentencing on April 11, 2022, when he appears before the Court for his sentencing hearing.

1. Defendant was originally charged with four misdemeanor offenses resulting from his involvement in the Capitol Hill protests of January 6, 2021.  They consisted of Theft of Government Property, inviolation of 18 U.S.C. §641; Entering and Remaining in a Restricted Building (Count One), in violation of 18 U.S.C. §1752(a)(1); Disorderly and Disruptive Conduct Which Impedes the Conduct of Government Business, in violation of 18 U.S.C. §1752(a)(2), and Disruptive Conduct in the  Capitol Buildings,  in violation of 40 U.S.C. 5104(e)(2). (ECF Doc. 1, January 28, 2021)

2. The government let the defendant plead guilty to one (1) count of Theft of Government Property ("Theft"), in return for not prosecuting him for the remaining charges in the complaint, or other potential charges relating to the January 6 events.  It filed a criminal Information alleging Theft, to which the defendant pled guilty on Jan. 5, 2022.   The plea agreement requires the defendant to pay restitution of $500.00 (five hundred dollars) towards defraying the roughly $1.5 million cost of repairs to the U.S. Capitol. (Presentence Report ("PSR"), p.. 4, ¶10)  By

pleading guilty, the defendant faces a sentence of up to one (1) year imprisonment, a fine of up to $100,000, a term of supervised release of up to one year, and a $25 special assessment. There is no agreement with respect to the government's or defendant's allocution at sentencing.

3. The government seeks a sentence of one-hundred twenty (120) days incarceration, one year of supervised release, sixty (60) hours of community service, in addition to $500 in restitution, which the plea agreement requires him to pay. (ECF Doc. 41, Government's Sentencing Memorandum ("Memo"), page 1, March 16, 2022) It asserts that such a sentence is "appropriate" because of six identifiable factors that "suggest() a lack of remorse." (Id.)

4. The U.S. Probation Office recommends a sentence of twenty-four (24) months probation, without incarceration or supervised release. (ECF Doc. 40, March 14, 2022, page 1) It based its recommendation on the defendant's lack of "prior criminal convictions, and (that) the instant offense is a petty offense and an aberration from an otherwise law-abiding life." (Id., page 2)

5. The defendant urges the Court not to order a period of incarceration. It may do by imposing either a term of probation, home confinement, or even a sentence of time served[1]. It would be presumptuous to say that the defendant deserves probation or a period of home confinement; closer to the mark would be to say the facts of the case, the defendant's own background, the history of plea negotiations, and his good-faith efforts to resolve the case, support it..

---

[1] Agents from the FBI arrested the defendant at his home in the early morning hours of Feb. 4, 2021. He was held overnight and presented to a U.S. Magistrate Judge the following afternoon, when he was ordered released on his own recognizance. (*See* Rule 5 documents, ECF Doc. 10, Feb. 9, 2021, pages 1 and 8) In contrast, defendants Emily Hernandez (21-cr-747) and Paul Westover (21-cr-697) in related cases were allowed to self-surrender. The defendant does not know why he was treated differently from the two others.

6. The defendant, his niece Emily Hernandez, and a friend, Paul Westover, came to Washington together to hear President Trump speak before he left office. All three were enthusiastic about the trip, though hearing the President was less important to Ms. Hernandez than simply the idea of travel to the nation's capital. Though they arrived in the area the night of January 5, insufficient planning or execution caused them to miss the speech. In the excited atmosphere, they joined the crowd as it left for the Capitol. When they arrived, they could see that the police had erected barriers to prevent people from further entering the grounds or the building itself. But when others breached that barrier, and crossed the line, they followed. By this point, of course, they had committed the illegal act of entering and remaining on the Capitol grounds. Then, after some effort, they entered the Capito. Once inside, they followed a crowd to a corridor at the end of which were Speaker Pelosi's chambers. There, a protestor dislodged from above the door a sign that marked the entrance to her chambers. It fell from the wall and then that (or another) protestor picked up the sign, smashed it against the corner of two wallst, and broke it into pieces. Ms. Hernandez moved toward the sign to pick it up as a souvenir. The defendant saw her as she did, and cheered her on.[2] Later, they left the Capitol and were photographed with the sign. Ms. Hernandez herself stole at least three other items, which the defendant discovered after they'd left the Capitol. (ECF Doc 36, Statement of Offense, page 6, ¶20) He expressed his disapproval with the words "Miss Sticky Fingers." The two were later

---

[2] The defendant disputes that he "induced" his niece to pick up the fragment, or to commit "multiple crimes" that day. (Govt. memo, pp. 17 and 22) She was already moving unmistakably to get a fragment of the sign as a souvenir when the defendant said to "get you a piece of it"; he did not instigate the act. Ms. Hernandez was an adult at the time, in her uncle's company but not his charge, and is responsible for her conduct. The other thefts she committed, possibly the result of immaturity, were without his knowledge and with his disapproval. But they show she acted independently of her uncle. Importantly, one of the items – the "Keep Off Fence" sign – the defendant believes Ms. Hernandez took from the Capitol grounds, where it had been detached from a barrier, *before* the three entered the Capitol itself. It was after they left the building that Ms. Hernandez revealed to the defendant she had that sign, too.

charged with Theft of the fragment of the Pelosi sign. The defendant was arrested at his home on February 4, 2021, and presented on a complaint the next day in a Rule 5 hearing in the U.S. District Court in St. Louis, Missouri.

7. The defendant cooperated fully with the government's investigation of this case. As early as February 25, 2021, only two weeks after defendant first appeared in this Court here, the defendant provided, through counsel, a proffer of his conduct, which the government sought to determine if a debriefing would be useful.

8. The government's policy in January 6 cases has been that persons charged with multiple misdemeanors but no felonies could choose the offense to which they preferred to plead guilty and have the remaining charges dismissed. Defendants charged with Theft were not allowed this indulgence. In such cases, a defendant would have to plead to Theft if one wanted the benefits of a plea agreement. Early on, the government made an exception to its own rule: Ms. Hernandez could plead guilty to a less serious (in the government's view) offense if the defendant took the Theft charge. It did so because it considered the defendant the responsible adult as the close, older relative of Ms. Hernandez, of having her in his charge, and so forth. For the defendant to have a chance at receiving probation it would be necessary for him to take the more serious charge because he was viewed as the more responsible party. This stood on its head the general practice of requiring the more culpable actor, i.e., the perpetrator, not the aider and abettor, to take the more serious charge or receive the sterner treatment. But the defendant was prepared to do this because his niece is dear to him, as dear as any living relative.

9. In an effort to persuade the government to recommend a probationary sentence, the government[3] invited counsel to submit an "advocacy letter" that would set forth the reasons for such a sentence and be reviewed by supervisors in the U.S. Attorney's Office. This counsel did; it was sent on or about June 16, 2021. Then a week later the government requested information about the defendant's medical history. The government reported that the supervisors looked favorably on the defendant's petition for probation. Among the various factors, the reviewers found compelling the defendant's medical history and condition, apart from the unusual facts of the case.

10. Some time elapsed between that advisory and the extending of the plea agreement. There was a nagging issue relating to the sufficiency of the evidence for the Theft. It was an issue the parties discussed in several conversations. Later, counsel discovered the case of *Morisette v. United States,* 342 U.S. 246 (1952). The Court held that Morissette had been prevented from presenting an affirmative defense of lack of intent, while admitting to the actual taking of the property.[4]

---

[3] Unless otherwise noted, the government refers to asst. U.S. Attorney Jessica Arco, who has handled this case from start to finish.

[4] For the crime of Theft, the government must prove that the item was both its property and had value. In Morissette, the defendant took bomb casings from a U.S. Air Force bombing range and sold them to a scrap dealer for $84. Like the defendant, Morissette trespassed onto government property. The bombing range was rich with game, mostly deer, and popular with hunters. Morissette drove his truck onto the range, in view of others, to get the casings. He maintained that he thought they had been abandoned, in other words, the government no longer treating the casings as its property; they had been left in the open to rust for as long as four years. Therefore, Morissette argued, he had no criminal intent to steal. The trial judge prevented Morissette from presenting this as a defense, and the judge effectively directed the jury to a verdict. The Supreme Court reversed the conviction. "Proof of criminal intent is part of every prosecution under 18 U.S.C. §641 *See Morissette v. United States*, 342 U.S. 246 (1952)" (https://www.justice.gov/archives/jm/criminal-resource-manual-1655-protection-government-property) -element-intent.) In this case, the affirmative defense would be that the defendant viewed the fragment of the sign as refuse, something to be disposed of. Even a mistaken belief, if reasonable, would be a defense. But of course the government could attempt to reassemble the sign. After negotiating over the language, the defendant agreed that the fragment "would have an independent market value of at least $50." (*See* ECF Doc. 36, Statement of Offense, page 6, ¶22) The govern- ment has not sought restitution for either that amount (as Ms. Hernandez returned the fragment to the FBI) or the replacement cost of the sign (estimated at $873).

11.  Counsel presented to the government an argument, supported by *Morissette,* for a plea to a different charge, in a lengthy letter dated Aug. 20, 2022.  That effort failed, and the defendant agreed to plead to Theft, thus sparing his niece from a similar conviction.  Per the government's offer, made by email on Nov. 29, 2021, Ms. Hernandez would be permitted to plead to an "unlawful entry misdemeanor (in violation of 18 U.S.C. §1752)"[5] if the defendant pled to Theft.  Though an aider and abetter, and not the instigator, the defendant took the more serious charge in order to help the perpetrator.  The defendant submits that his plea of guilty to Theft should be properly viewed.partly as an act of magnanimity, meant to help a dear one avoid conviction for that crime.  Of course, the defendant did not intend to have a trial in any event, because he recognized without qualification that he was guilty, at a minimum, of  illegal trespass, and that the evidence was probably sufficient on the remaining charges.[6]  There was never an issue of whether or not the defendant would plead guilty; the only question was to what offense.  In other words, he took and *takes* responsibility for his conduct.

12.  It therefore came as something of a shock when the defendant saw that the government would seek a sentence of 120 days incarceration, apart from the many hours it recommends of community service. Counsel spoke with the government about its recommendation, which differed dramatically from what the defendant had been led to expect.  The government explained that it is no longer recommending or not opposing probationary sentences, which it did early on in ten or fewer January 6 cases; now it asks for incarceration,

---

[5] Knowingly Entering or Remaining in any Restricted Building or Grounds.

[6] So there is no confusion, the defendant concedes that he committed the acts (satisfying the elements of the offense) that constitute Theft of Government Property.

either in prison or by home confinement, in every misdemeanor sentencing. It's clear that its policy has changed, to the defendant's detriment.[7] The defendant adds that the parties worked very hard towards a resolution of the case, and neither side is responsible for the length of time it took to work out an agreement.

12. The history recited above supports the defendant's view probation would be the appropriate sentence. But this is not the only factor that supports it. The defendant has no criminal record. He was sixty-two years old when he committed this offense (or these offenses). He does not belong to, nor was he part of any extremist group that planned to disrupt proceedings in the Capitol or undermine the workings of democracy. His only purpose in coming here was to see and hear President Trump in what was likely to be his last public appearance. It was not even to protest election results, or try to "stop the steal." The defendant acted non-violently while on the Capitol grounds and in the building itself. He did take part – a vocal part, which involved vulgar execrations of Speaker Pelosi, for which he is now ashamed[8] – in the protest and demonstration inside, but left without hurting persons or things.

13. The Court must consider, under 18 U.S.C. §3553(a) the following factors:

(a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider

---

[7] That's why the defendant is not arguing "detrimental reliance," because it was always his intention to plead guilty and spare the Court a needless trial. It's not as if he would have exercised his right to a trial. Nor does the defendant accuse the government of bad faith. It has the prerogative of changing its policy. It should, however, take into account its effect on cases that reached agreements before the change.

[8] In a simulated phone call to Speaker Pelosi. Though the words were vile, the defendant words carried no threats. (Govt. memo, page 9)

- (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

  14. The defendant is confident that with the information already submitted, the Court has considerable understanding of "the nature and circumstances of the offense and the history and characteristics of the defendant." Defendant adds that he has significant medical problems – which have worsened in the past year – needing attention, including the intravenous administration of vitamins twice weekly[9]; that he tends to a sister who is seriously ill and needs his help; that he lives by himself and cares for his dog, with him for eleven years, whom the defendant despairs of having to leave and make other arrangements for in the event of incarceration.

  15. The defendant submits that a probationary term would satisfy the factors in (2), inasmuch as the offense involved not an intact item but the fragment of a sign broken apparently beyond repair. Likewise, the defendant's history as a law-abiding citizen should assure the Court that there's no reason to think the defendant will commit further crimes, especially given the unique circumstance of the instant offense. Thus, deterrence of the defendant individually or the public at large would not be disserved by a probationary term.

---

[9] *See* attached Exhibit.

16. Last, a sentence of incarceration would actually interfere with the defendant to obtain the proper medical care he needs, noted earlier and in detail in the PSR. (*See* ECF Doc. 37, PSR, page 10, ¶65)

17. It is the defendant's view that the recommended sentence of 120 days lacks a sense of proportion when applied to the conduct here.  The government identifies six factors which it asserts justifies its recommendation and that "his conduct after breaching the Capitol –when the import of his actions should have been clear – suggests a lack of remorse." (Govt. memo, page 2) On the contrary, the defendant feels deeply remorseful.  His conduct left him sleepless for a week after his return to St. Louis.  It left him regretting his actions, wishing he'd not joined the crowd as it closed in on the Capitol after he had missed the president's speech near the Mall.  Even the government reports that he felt badly for his niece when it seemed, before his arrest, that only she would be held responsible and that "I didn't want this to happen to you." (Govt. memo, page 13)  And his words during the post-plea debriefing that the Capitol was "our building" that "he had paid for" were an expression only of tender, patriotic feelings for the structure and what it represents, not "some sort of excuse" for his conduct on January 6. (Govt. memo, page 19)

18. The government also describes the defendant as "among the most culpable (of) misdemeanor defendants arising out of the Capitol Breach.  Indeed, to date[10], no other Capitol Breach has been sentenced on a theft conviction."  Since it filed its Memo, another such defendant has been sentenced.  Robert Petrosh[11], a 52 year-old ex-Marine with no criminal record, owner and operator of a business, was prosecuted for stealing two working microphones

---

[10] Its memo was filed March 16, 2022.

[11] *United States v. Robert Lee Petrosh,* 21-cr-347 (TNM), sentenced March 25, 2022.

from a podium located in Speaker Pelosi's chambers. They had a value of $438. The government there recommended an identical period of incarceration for that offense – 120 days in prison; the probation office recommended ten days. Judge Trevor N. McFadden followed the probation recommendation, imposing ten days incarceration, one year of supervised release, and a fine of $1,000, and ordered both restitution of $938 and the return of the microphones. Mr. Petrosh's conduct dwarfs the defendant's conduct in scale and, one could argue, in kind (i.e., intact, operable items compared with a fragment of a broken sign). Yet the government chose to make identical recommendations of incarceration. This suggests a lack of proportion in the instant case.

19. The defendant assures the Court that this experience has chastened him. He professes a love of this country and disappointment in himself because of his own conduct. Joining a riotous crowd, entering the grounds and Capitol without permission, acting and speaking disrespectfully as he did, were affronts to civilized behavior. He recognizes that the dynamic of a crowd and its fluid character can become dangerous. It's not something he had ever participated in before. He vows he won't ever again.

For the reasons stated, the defendant requests that the Court impose a sentence of probation or a period of home confinement.

This pleading is,

Respectfully submitted,

/s/

NATHAN I. SILVER, II
Unified Bar #944314
6300 Orchid Drive
Bethesda, MD 20817
(301) 229-0189 (direct)

(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on Jessica Arco, Esq., trial attorney and detailee, U.S. Attorney for the District of Columbia, this 7th day of April, 2022.

/s/
_____
*Nathan I. Silver, II*